### HENGER v. SMITH et al.
### No. 4596.

Court of Civil Appeals of Texas.
El Paso.
April 20, 1949.

Rehearing Denied May 25, 1949.

O. O. Touchstone, Dallas, for appellant.

Carter Gallagher & Barker, Ben T. Warder, Jr., and Howard Barker, Dallas, for appellee Smith.

Burford, Ryburn, Hincks & Ford, Logan Ford and Roy L. Cole, Dallas, for appellee Insurance Co.

PRICE, Chief Justice.

This is an appeal from the judgment of the District Court of Dallas County, 14th Judicial District. Haskell Smith, as plaintiff, recovered a judgment against W. C. Henger, d/b/a Henger Construction Company, defendant, in the sum of $28,-000.00, for personal injuries alleged to have been suffered by him as a result of the negligence of defendant. The Texas Employers Assurance Association intervened as a party plaintiff, claiming subrogation to the right of plaintiff Smith to the extent it had paid to Smith workman's compen-

sation insurance on a policy of workman's compensation issued in favor of his employer, Westheimer Rigging and Heavy Hauling Company as to its employees, to the extent of something over $8,500.00. It was provided that recovery of Smith's should inure to the benefit of said intervenor to that extent.

Haskell Smith will be hereinafter referred to as "Smith"; the Westheimer Rigging & Heavy Hauling Company as "Westheimer"; the Mercantile National Bank of Dallas will be referred to as the "Bank".

Trial was to the court with a jury, submission on special issues, and judgment was rendered on the verdict as above stated. Smith was an employee of Westheimer at all times relevant herein. Westheimer had contracted with the bank to lower certain heavy machinery into the basement of an office building which the bank was having constructed in the city of Dallas. This contract, while by its terms was with Henger, was authorized by the bank, and was to all intents and purposes a contract between the bank and Westheimer.

Prior to the 16th day of January, 1943, the bank had let sundry and various contracts in connection with the erection of this large office building. On the date as mentioned construction had proceeded to a considerable extent, and there were a great many contracts outstanding for work, labor and material. The plans and specifications for the building were drawn by the bank's architect. On January 16, 1943, the bank entered into a contract with W. C. Henger, in substance and effect that Henger in consideration of $50,000 would supervise and co-ordinate all of the work and construction in connection with the construction of said building, and would provide a complete and competent job organization as might be necessary to properly supervise and co-ordinate the construction of said building, so that all other work would be done in accordance with the plans and specifications of Walter W. Ahlschlager, Architect. This $50,000 compensation was payable $3,000 per month until $42,000 had been paid, and the balance of $8,000 when the building was finished to the satisfaction of the bank. It is provided in the contract that Henger should be referred to publicly and in the contract as General Contractor, but the use of the term in the contract or publicly should not in any way increase or decrease his obligations, his duties and liabilities as a general supervisor and co-ordinator of the construction of the bank's building. The contract further recites that the bank had purchased and entered into contracts for the purchase of materials to be used in the building, and numerous construction contracts covering specific work which had not yet been completely performed, and Henger was to have exclusive control of the supervision and co-ordination of the construction of said building under said contracts and contracts thereafter to be made by the bank. It was provided that the bank expressly reserved the exclusive right to purchase any and all materials, and to let such additional contracts for the construction of specific parts of the building as it desired, in its sole discretion; that Henger should not let any sub-contracts or purchase any materials except upon the written direction of the bank, and in such event all such contracts and purchases shall be charged to and paid by the bank. It provides for renting from Henger a certain hoisting engine; provides that Henger should do certain carpentry and other construction work with his own employees, but for such expense and payrolls he should be reimbursed, such work to be upon written direction of the bank. Henger further bound himself to devote approximately two-thirds of his own time to the performance of this contract. It is further recited: "It is expressly understood and agreed that this contract is largely one for the personal services of the aforementioned W. C. Henger, and in the event of his death prior to the final completion of the building, the bank shall have the option of terminating this contract."

It is averred that Henger under this contract entered into the exclusive possession of the building and the premises upon which it was being erected. Prior to the date of the injury to Smith there had

been constructed a shaft leading from the first floor into the basement to a depth of about forty-three feet. The purpose of this shaft was to lower heavy equipment into the basement; that in connection with lowering such heavy equipment and machinery into the basement, a distance of about 43 feet, there was a substantial derrick erected over the opening of the shaft. This shaft and the derrick had been erected prior to the time Westheimer started the performance of its contract.

Westheimer's crew, of which Smith was a member, used this shaft on the afternoon of March 12th, 1943, and stopped work about 2:30 P.M. awaiting further materials to be delivered and to be lowered into the shaft. There was testimony when the Westheimer crew quit work on the 12th they covered the opening of the shaft with boards and timbers which were provided, and covered this covering with a canvas. The purpose of the canvas was to protect those working in the base- from the inclemency of the weather. Smith and the other members of the Westheimer crew reported for work about 8 o'clock on the morning of March 13th. They were shortly thereafter informed that there would be no work with the shaft until noon. Smith, on the request of his superior, went to the shaft for the purpose of making an inspection to determine the best way to install a line and to handle and move some heavy equipment after it had been lowered to the basement. He sought to lift up the canvas and peer down in the shaft, when in some way his feet slipped and he went down through a portion of the top of the shaft which had not been covered by boards. He sustained serious and painful injuries. Henger is charged with a number of negligent acts and omissions, each of which is alleged to be the proximate cause of Smith's injuries. Among the acts and omissions so charged are the following:

"Failing to have an adequate protecting banister or railing around such shaft; failing to maintain the premises in question in a reasonably safe condition; failing to properly inspect the premises in question in order to see that they were main- tained in a reasonably safe condition; failing to have the opening of such shaft securely covered with timber over the entire surface of such opening, and failing to warn plaintiff that the canvas tarpaulin covering the shaft was not supported by timbers completely covering and protecting the open portion of the shaft."

In response to special issues the jury found in substance as follows: That on the occasion in question W. C. Henger failed to have an adequate railing around the shaft in question; that such failure was negligence and was a proximate cause of the fall of Smith; that prior to the fall Henger failed to properly inspect the shaft in question, that such failure was negligence and such negligence the proximate cause of the fall of Smith; that at the time Smith fell the shaft was not securely covered with timbers over the entire surface of the opening, that it was negligence to fail to have the shaft so securely covered, and such negligence was a proximate cause of the fall of Smith; that the failure to warn Smith that the tarpaulin covering of the shaft was not supported by timbers securely covering the entire surface of such opening was negligence, and such negligence was a proximate cause of the fall of Smith.

Certain issues of contributory negligence were submitted on behalf of Henger, but all of these were found in favor of Smith. Henger moved for an instructed verdict at the close of the evidence, which was refused by the court, and after the verdict was returned moved for judgment non obstante veredicto. This was overruled, and judgment entered as aforesaid.

This case is a little out of the ordinary in that in most cases involving a construction as large and complicated as the one here there is ordinarily a general contractor for the entire work; various portions of the work are ordinarily performed by sub-contractors, sub-contractors having contracted with the general contractor. Here this construction had progressed to a considerable degree through contracts for portions of the work of construction let by the bank, the owner, to various contractors.

The bank on the 16th day of January, 1943, made and entered into a contract with Henger whereby Henger was to co-ordinate the work and supervise the construction for the bank. The bank had, at the time of its contract with Henger, a great number of contracts for material and construction. These parties having these contractual relations with the bank were, it is presumed, independent contractors. There was no evidence that any considerable number of same were employees of the bank. Any duty Henger had as to this construction and as to the employees of independent contractors engaged therein arose by virtue of his contract with the bank. As to these independent contractors the bank had no power to direct the manner in which their work was performed. It did have the right to the result which they had agreed to achieve; it had the right to supervise and inspect their work, to determine that the contractor conformed to the contract. While on the premises the bank owed to such contractor and his employees the duty of ordinary care as to the safety of the premises upon which they had come by the implied invitation extended by the contract. It was not its duty to warn such independent contractors or their servants of open and obvious dangers existing on the premises, or of such dangers of which they had notice. Ray v. St. Louis. Southwestern R. Co., Tex.Civ.App., 289 S.W. 1030, Wr. Ref.; Hailey v. Missouri, K. & T. R. Co., Tex.Civ.App., 70 S.W.2d 249, Wr. Ref.; Holt v. Texas-New Mexico Pipe Line Co., 5 Cir., 145 F.2d 862; Union Tank & Supply Co., v. Kelley, 5 Cir., 167 F.2d 811; Houston Nat. Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374.

It was not its duty to warn them or protect them from dangers incident to the use of the premises of which such contractors and their employees had notice, actual or constructive. The duty to use ordinary care to warn and protect applied to hidden, latent dangers, which were known or should have been known in the exercise of ordinary care, to the bank, and of which the employees of the independent contractor were unaware. Cunningham v. International R. Co., 51 Tex. 503, 32 Am.Rep. 632; Ray v. St. Louis Southwestern R. Co., supra; 57 C.J.S., Master and Servant, § 606, pages 377-379.

Neither the bank nor any one deriving authority from the bank had the right to control or direct the acts of the employees of the independent contractors. The relationship between it and the servants of the independent contractors was not that of master and servant—it did not owe the duty of a master to a servant.

It was not responsible for the negligent acts or omissions of independent contractors engaged in the work of construction. If, in the exercise of ordinary care, it became aware of a dangerous condition existing by virtue of the negligence of an independent contractor, it was perhaps under the duty of taking steps after such notice to warn the other independent contractors and their servants of the existence of the danger. It may be that Henger, under his contract with the bank and his action under the same, had the same duty toward the independent contractors and their employees as the bank. In disposing of this case we shall so assume. However, there is this substantial distinction between the case of Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S.W. 517. There the defendant assumed actual charge and through its employees actually ran and operated the elevators. Here Henger did not.

It is of no importance to determine whether the bank remained liable after the contract with Henger—the bank is not a party to this suit. Henger, under the contract, was entirely free as to the manner in which he co-ordinated and supervised the construction of the building under contracts let and to be let by the bank. Henger had no choice as to who came upon the premises to construct same. When he came upon the premises the contractors there who had come there under pre-existing contracts were not there at his instance, and were not sub-contractors under him—at least they had no contracts with Henger. Under the contract between Henger and the bank, Henger had no power to let contracts without the special authorization of the bank. Subject to

the contract and by the terms thereof the bank reserved the power to make all contracts necessary to the completion of the building. Under the contract, as far as is relevant here, Henger had neither power nor duty to do anything but co-ordinate and supervise; under written direction of the bank he was bound to do certain construction work. He had no coercive power over the other contractors lawfully on the premises. If they failed to conform to their contracts he had no power to refuse or withhold their pay. All he had a right to do was to report their defaults to his principal, the contractee bank. He had neither the power nor the duty to exclude such contractors from the work and properly perform their agreement. He was not paid to do this. Smith clearly was not an invitee of Henger. He was on the premises as an invitee of the bank.

■ There is, however, some evidence that Henger and employees took over the possession of the premises under and by virtue of the contract with the bank; that under his construction and the construction of the bank he agreed with the bank to discharge the duty of the bank in connection with the safety of the contractors and their employees on the premises in pursuance of their contracts with the bank. If such was the action of the parties under the contract, it is thought that Henger would be liable for failure to use ordinary care to discharge such duty as the bank owed to the contractors and their employees on the premises under and by virtue of their various contracts with the bank. Fox v. Dallas Hotel Co. supra. However, it must at all times be borne in mind that Smith was not an invitee of Henger.

For some time prior to the date of the injury Smith had used this shaft. He had been an employee of another contractor that made use of the shaft immediately prior to its use by Westheimer, was in every way familiar therewith, familiar with the mode of covering same and protecting same with a tarpaulin after it was covered; aware, according to his own testimony that frequently after the shaft had been covered with timbers and the tarpaulin, that others would use same and cover it with the tarpaulin and not cover the top entirely with timbers.

The following testimony of Smith indicates his knowledge that at times the canvas covering the top of the shaft was not supported by boards covering same.

"A. This tarpaulin was laying on the middle timbers and the wind was blowing against it and flopping up and down and you couldn't see these 2 by 10's on the outside because it was stretched over there and sagged and tied to the legs of the derrick, and there was no way to see how the timber was under that tarpaulin.

"Q. Look at Exhibit 1 and point out to the jury where the 2 by 10's would have been had they been there. A. They would have been on the toe of this angle which is sticking in here. The 2 by 10's covered this 20 inches of space in here. I was standing here and looked over this way, and I reached over to get that and the corner of that was tied to that leg there. No way to determine that except to get down on my knees, and I don't make a practice of that in this iron work. There was some pebbles or gravel there— I don't know yet how I got in the hole. * * *

"Q. Was there any difference in the way this shaft appeared to you on the morning of March 13th from the way it appeared to you when it was properly covered by your men? * * * A. This tarp looked as it had at any time during the time we had put it there, and I had seen it many times * * *.

"Q. The portion of the hole through which you fell is this west end, is that correct—southwest end? A. That is right."

And from cross-examination:

"Q. On which side of the derrick were you? A. I was on the southwest corner, against the building.

"Q. Let's see if we can show the jury just where you were here on one of these exhibits. I will let you find the one you can show it best in. A. This one right here.

"Q. Will you take the pencil and hold it up so the jury can see and you show them where you were standing. A. I was

standing right here, jurymen; right against this door facing, right in there.

"Q. In other words, the braces were on the side that you were standing on? A. That is right.

"Q. Those X-braces you see here in plaintiff's Exhibit I? A. That is right.

"Q. All right. Is this the angle iron that sticks up six inches there? A. That is right.

"Q. Were your toes against that? A. Yes, sir. When I turned around—now, then, this is the action I went through * * *. I testified I turned around and started to pick up this canvass to look under it, to see how to put a block down this hole, and gravel was under my feet and my legs were against this here, and why I went in the hole I don't know to this day.

"Q. That is what I understood you to say. Let's see where your body was. Did you crawl under these braces and get inside this angle iron, or did you stand outside the angle iron and braces? A. I stood straight up. This angle iron hit me across this way. Take this here, for instance, this angle iron run down here and hit me right here. I was leaning over like this, and had my arm hanging on that brace right there. I had my hand on this brace right up here, and I leaned over to get hold of this canvass here. When I leaned to get hold of the canvass, my feet went out from under me, and that is all there is to it.

"Q. In order to do that, you had to go through these braces? A. That is right.

"Q. And outside of this angle iron? A. That is right.

"Q. And you had to lean through the braces? A. That is right.

"Q. Did you lean through this space, or under it? A. I leaned through that space. Naturally I would; had something to lean against.

"Q. And you reached over with what hand to pull up the tarpaulin? A. Right hand.

"Q. And you don't know how you slipped in the hole? A. My feet went out from under me. and that is exactly how

I went in; only way I could have done it.

"Q. You know the hole was there? A. Yes, sir; but I didn't know what was under that canvass; supposed to be some boards there, that weren't there. The only reason I fell in the hole, there wasn't anything to catch to."

The following testimony of Smith's indicates his knowledge that at times the canvas covering the top of the shaft was not supported by boards covering the same:

"Q. Now, Mr. Smith, I was asking you about those other sub-contractors and their employees that used that hole at nights. They, of course, had to remove the timbers and tarpaulin from the hole in order to use it, didn't they? A. Yes, sir.

"Q. And they did that frequently? A. That is right.

"Q. Both day and night? A. Yes, sir, that is right—at night.

"Q. It wasn't anything unusual for you to come up and find the barricade out of place, was it? A. That is right.

"Q. You frequently came on the job and found the timbers were removed? A. That is right.

"Q. And sometimes one of them would be out of the way and moved, and sometimes others; is that right? A. That is right.

"Q. And you have found as many as three or four of the timbers moved and out of place when you would go there in the morning? A. After we would take the tarpaulin off, yes, sir.

"Q. One particular morning you found that the timbers had been removed and the steam fitters had put a boiler down through there? A. A small drum, yes sir; four by four, or something like that.

"Q. And you found the timbers moved out of place and the tarpaulin out of place when you got there the next morning? A. That is right.

"Q. As a matter of fact, on that particular occasion, they had moved all the timbers but one, hadn't they? A. I think so. * * *

"Q. When Westheimer was through with the use of the shaft in the evening, state whether or not the shaft was covered? A. The shaft was covered, as far as I know, yes, sir. That was supposed to be the last thing we did in the evening, was cover this hole up thoroughly before we left there.

"Q. On March 12th, the day prior to your injuries, do you know whether or not the shaft was covered? A. Directly, I wouldn't say, because I never went around the hole to look to see, but it has always been a policy to cover the hole up—

"Mr. Touchstone: We object.

"The Court: I sustain the objection.

"Q. I will ask you whether or not the men in your crew, or you, made it a practice to cover the hole prior to their leaving in the evening? A. The men in our gang, yes, sir.

"Q. In so covering the hole, Mr. Smith, what timbers were used? A. The big timbers were shoved out over the hole to cover the part they would, and the little ones fit in there securely at each side, 2 by 10's or 2 by 12's, or what have you.

"Q. Did they completely cover the hole so as to prevent a man from falling through it? A. Yes, sir. * * *

"Q. But whenever you quit, whether four-thirty or five or six or six-thirty, then you had been instructed by Pete Billings to cover that hole properly? A. That hole was covered properly every evening when we left there.

"Q. I didn't ask that. Weren't you instructed to do that by Pete Billings, their foreman? A. The whole gang was instructed, not just me. Every man was instructed to cover that hole safely before we left that job.

"Q. That is the instruction Pete Billings gave you? A. Gave every one of us.

"Q. And you did cover it every day when you finished your job? A. Yes, sir, that's right. That is one particular job we saw was done. * * *."

The Westheimer crew, of which Smith was a member, ceased work at 2:30 P.M. on March 12th, 1943. Of course, incidental to the work they uncovered the shaft in question. There is the testimony of one member of the crew that upon ceasing work, before the canvas was tied over the top of the shaft the top was securely covered with timbers and boards as contemplated. Smith, a member of the crew, had no personal knowledge that same was so covered.

That inference that the top of the shaft was uncovered between 2:30 P.M. on the 12th and 8:30 A.M. of the 13th of March must rest on the testimony of this witness and the fact that it was not so covered at 8:30 A.M. on the 13th. Beyond any question there were others on the premises that had the opportunity to so uncover the shaft. However, the evidence utterly fails to show that any one had any occasion to make use of the shaft between 2:30 P.M. of the 12th and 8:30 A.M. on the 13th. If the shaft was securely covered by Westheimer at 2:30 P.M. on the 12th, when and by whom it was uncovered rests entirely on surmise and conjecture. During such period of time there is a total lack of evidence that any use was made of the shaft; that the covering or any part thereof was in any manner tampered with. Of course, if the shaft was securely covered by Westheimer at 2:30 P.M. on the 12th, some one removed the boards. If this be true, the question then remains, by whom was this done, and when? The answer to neither of these questions can be deduced from the evidence. The question can only be answered by surmise and conjecture. A reasonable answer must arise from the evidence to support either the finding of negligence or proximate cause.

Among the findings of the jury of negligence are the following:

Failure to have an adequate railing around the shaft; failure to have the shaft securely covered; failure to warn Smith that the shaft was uncovered. As to each of these grounds of negligence there is a finding of proximate cause in favor of Smith. It was also found that there was negligence on the part of Henger in his failure to inspect.

■ It seems too obvious to merit discussion that the failure to have a guard rail

could not by any stretch of the imagination have either been negligence as to Smith or the proximate cause of his injury. Smith knew of the existence of the shaft, and so far as he was concerned required no warning thereof. Smith v. Humphreyville, 47 Tex.Civ.App. 140, 104 S.W. 495, Wr.Den. It was found that the failure to have the shaft securely covered was negligence. The contract between Henger and the bank created no duty on the part of Henger to do any part of the work of the other contractors. There was no evidence that Henger caused the shaft to be uncovered. The covering of the shaft and leaving same reasonably safe was the duty of the contractors using the shaft in the legitimate discharge of their contracts.

If Henger did not have notice that a portion of the top of the shaft was only covered by the canvas there could be no duty to warn of such condition. True he might be negligent in failing to ascertain this. Furthermore, Henger, so far as the evidence establishes, had no reason to know that Smith was going to make use of the shaft at the time and in the manner he was attempting to use same when he was hurt. In a case such as we have here, without knowledge or notice there is no duty to warn. Here Henger had no notice of the condition of the shaft; was without notice that Smith would make use of the same prior to 12 o'clock on the 13th. There is no evidence that the exercise of ordinary care in making an inspection would have prevented the accident.

The jury found that Henger failed to properly inspect the shaft in question before Smith's injury, and that such was negligence, and was a proximate cause of Smith's injury. They also found that failure to warn Smith that the tarpaulin covering the shaft was not supported by timbers was negligence and was a proximate cause of the fall of Smith. However, no point is made that the findings are conflicting.

If this judgment is justified it must be from the finding of negligence in failing to inspect. There inheres in the breach of duty to inspect the idea of voluntary ignorance of the situation or condition where there is duty to acquire knowledge thereof for the protection of others. In order that the failure to conform to the duty of inspection to constitute actionable negligence, such omission of duty must be the proximate cause of the damage complained of. If we are to take the theory of Smith at its full value that at the time his employer Westheimer ceased to work the opening of the shaft was securely covered, an inspection at that time would not have prevented the injury of Smith. There is no evidence that with the knowledge and consent of Henger or his employees the shaft was used prior to the injury to Smith. The best time to have made an inspection of the shaft as to whether same was securely covered would have been just before Smith sought to peer down same for a purpose, according to his testimony, incidental to his employment with Westheimer. The evidence is lacking that either Henger or his employees had any notice that Smith or any of the employees of Westheimer would make any use of the shaft prior to 12 o'clock M. on the 13th. Smith had a better opportunity to inspect the covering of the shaft before using same for the reason he knew he was going to so use the shaft and Henger did not.

Furthermore, the use of the shaft by Westheimer and his employees entailed the necessity of uncovering same. In doing this work Smith would have been subject to exactly the same danger he was in peering under the canvas. According to his own testimony he knew the presence of the tarpaulin was no guarantee that the top of the shaft was covered by boards.

Henger had no reason to believe that Smith would make any use of the premises prior to 12 o'clock on the 13th. It is very clear from the evidence that Smith's action was unusual, at an unusual time, and that he was charged with the same notice as to the necessity of an inspection as was Henger. He knew he was was going to attempt to peer down this shaft at the time he did so attempt, and Henger did not have this notice.

The verdict acquitted Smith of contributory negligence. It was specifically found that Smith was not guilty of negligence in

attempting to raise the tarpaulin and look under it without first ascertaining if the timbers were in place. Had he known the exact condition that existed it was not necessarily negligence to raise the tarpaulin and look down the shaft. Smith himself was unable to clearly state just how he happened to fall down the shaft. He did not intend to get on the covering of the top of the shaft. From day to day, in the performance of his duty for Westheimer and his previous employer he was near this uncovered shaft. He had no doubt assisted in removing the canvas or saw it removed.

The covering of the shaft was not primarily for the protection of those using the shaft to lower machinery and material into the basement. These persons knew of the existence of the shaft, knew of the danger attendant on its use. The use of the shaft as contemplated necessitated the uncovering of same. Their work necessitated their presence near the uncovered shaft. It must have been the covering of the shaft was primarily for the protection of those whose work called upon them to be around and near the shaft when same was not in use. When in use the use made gave notice of the existence of the unprotected shaft. When not in use the barriers and canvas gave notice of its existence.

If ordinary care called for an inspection of the shaft in question before same was used, Smith had as much knowledge of this necessity as Henger. Smith had a better opportunity to make such inspection because he knew that he was going to peer down the shaft at the time he did, and so far as the evidence goes, Henger was without this information. If there was loose dirt near the edge of the shaft this condition was obvious to Smith; it was obvious that the canvas concealed the boards.

As has been stated, the use of the shaft contemplated that Smith and his co-employees should remove the covering from the top of the shaft. The only protection they would be afforded by the board covering of the shaft would be during the time they were engaged in removing the canvas. In the opinion of the majority the evidence fails to show negligence on the part of defendant Henger in failing to inspect this shaft; failure to show this because if there was the necessity of inspection Smith knew of this necessity and had a better opportunity to make same than Henger. Had a better opportunity in that he knew when he was going to peer down the shaft and Henger did not have notice of his intention to do so. If he desired to inspect the shaft there was a stairway leading down to the basement available.

A contractee does not owe the duty to the employee of an independent contractor to warn him of obvious dangers on the premises, does not owe the duty to warn him of dangers of which such employee is aware or in the exercise of ordinary care should be aware, and of which he is as well aware as the contractee. Bennett v. Louisville & N. R. Co., 102 U.S. 577, 26 L.Ed. 235; Procter v. San Antonio St. R. Co., 26 Tex.Civ.App. 148, 62 S.W. 938, W.R.; Galveston, H. & H. R. Co. v. McLain, Tex.Civ.App., 218 S.W. 65, Wr.Ref.; Beeville Cotton Oil Co. v. Sells, Tex.Civ.App., 84 S.W.2d 575; Texas & P. R. Co. v. Howell, Tex.Civ.App., 117 S.W.2d 857; Fort Worth & D. C. R. Co. v. Hambright, Tex.Civ.App., 130 S.W.2d 436, Dis., Correct Judg.; Blaugrund v. Paulk, Tex.Civ.App., 203 S.W.2d 947, N.R.E.; Houston Nat. Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374; 38 Am.Jur. p. 757–758, par. 97; 57 C.J.S., Master and Servant, § 600, page 373.

Further, it is the opinion of the majority that if the conclusion that there is no evidence tending to show negligence on the part of Henger in failing to inspect the premises, there is likewise no evidence to show that such failure to inspect was the proximate cause of plaintiff's injuries. If the shaft was properly covered at 2:30 P. M. on the 12th there is no evidence to show when it was uncovered. There is lacking evidence that Henger knew of the condition of the shaft or in the exercise of ordinary care should have known of same.

Justice McGill prepared the original opinion for the court reversing and rendering this case. However, he is now of the opinion that the motion for rehearing

should be granted and the case affirmed. In view of the fact that there was an inadvertent inaccurate statement as to the testimony in the original opinion, the same is withdrawn and the above and foregoing is substituted therefor.

It is therefore ordered that appellee's motions for rehearing herein be in all things overruled.

It is further ordered, in view of the change and withdrawal of the original opinion, that appellees be granted the customary time in which to file another motion for rehearing.

McGILL, Justice (dissenting).

In our original opinion we relied on Smith's testimony referred to in the statement under points numbers one, two and three of Appellant's Brief as being all of the testimony bearing on the question of whether Westheimer's men properly covered the hole when they quit work on March 12, 1943. Since the disposition of the case at which we arrived did not require consideration of appellant's point No. 17, the testimony of McCullough and Miller referred to in appellee Smith's 20th counterpoint in reply to appellant's 17th point escaped our attention. I agreed to the disposition of this case on original hearing with increasing reluctance and with grave doubt. That doubt has grown into a firm conviction that we were in error. The following was written in lieu of our original opinion, but since my brethren adhere to our original disposition of the case, it is respectfully filed as my dissent.

Prior to January 16, 1942, the Mercantile National Bank at Dallas (hereinafter referred to as "the bank") entered into numerous construction contracts with various parties covering specific work to be performed in the construction of its new office building known as the Mercantile Bank building, on its property in Dallas. The building had been in the process of construction for approximately six months prior to the above date. Prior thereto, for some years, appellant W. C. Henger had been a general contractor engaged in construction work in Dallas under the name of Henger Construction Company. I shall hereafter refer to him as "Henger". On January 16, 1942, he entered into a written contract with the bank by which he agreed to supervise and co-ordinate the construction of its new office building so that the work would be done in accordance with the plans, drawings and specifications of Walter Ahlschlager, the bank's architect. The contract provided that Henger should have exclusive control of the supervision and co-ordination of the construction of the building. The bank reserved the exclusive right to let such additional contracts for the construction of specific parts of the building as it deemed advisable, the contract providing that Henger should not let such contracts except upon its written direction. Henger, with a large supervisory force employed by him, immediately assumed his duties under the contract. On February 22, 1943, pursuant to instructions of the building committee of the bank he entered into a written contract with Westheimer Rigging & Heavy Hauling Company, Inc., of Houston (hereinafter referred to as "Westheimer") for lowering heavy air conditioning equipment into the basement of the building. Appellee Haskell Smith (hereinafter referred to as "Smith") was an employee of Westheimer. On March 13, 1943, he suffered serious personal injuries caused by his falling into a shaft or hole used by Westheimer in the performance of its contract. This suit was instituted by Smith to recover damages for such injuries from Henger. Appellee Texas Employers' Insurance Association (hereinafter referred to as the "association") carried workmen's compensation insurance for Westheimer. In settlement of a suit filed by Smith against it for compensation under the state Employer's Liability Act, the association paid Smith $6500.00. It intervened in this suit, claiming subrogation to Smith's rights in any recovery to the extent it had paid him, plus reasonable attorneys' fees. Trial was to a jury, and judgment was rendered on special findings in favor of Smith against Henger for $28,130.00, with subrogation in favor of the association in the sum of $8,666.67, $6500.00 thereof being the amount the as-

sociation had paid Smith in discharge of its liability under the Employers' Liability Act, and $2,166.67 thereof being attorneys' fees. Henger has appealed from the judgment in its entirety; Smith has appealed from that portion of the judgment which awards attorneys' fees to the association.

A brief description of the shaft, or hole, and of the manner in which it was covered and a summary of Smith's testimony describing how he fell into it will aid in a better understanding of the points involved.

The hole, or shaft, was a 6 x 10 ft. hole cut into the concrete sidewalk on the outside of the Mercantile Bank building, just east of the entrance to the building under construction. It extended to the sub-basement of such building, which was approximately 42 ft. below the sidewalk level. There was a barricade, or board fence, eight or nine feet in height completely around the building, enclosing the wall of the building and the sidewalk. The shaft, together with a derrick and rig above it was used by Westheimer to lower the heavy air conditioning equipment into the basement and sub-basement. Smith was an experienced structural steel worker and rigger. He testified that he first went to work on the bank building job for the American Transfer & Storage Company (hereinafter referred to as "American") about three weeks before the accident; that the first work he did was to weld a derrick in order that heavy vault doors might be lowered in the basement and sub-basement. This was done by American. That the derrick had regular braces every five feet, just as an oil well derrick; that its height was 22 or 23 ft., and it was increased in order to permit the lowering of air conditioning equipment by Westheimer; that while he was working for American there were large 5 x 15 ft. timbers which were placed over the hole in order that heavy machinery could be hoisted thereon and lowered into the basement; that the hole was blocked at the base by angle irons which extended six inches above the sidewalk level; that the timbers which were pushed over the hole were 11 inches above the sidewalk; that these large timbers would not entirely cover the hole but would leave approximately 20 inches at each end; that there were available 2 x 10 ft. timbers of proper dimensions to fit the angle irons to be placed inside the angle irons at each end of the shaft; that when they were through with the use of the shaft for each day the 2 x 10's were placed therein and the shaft was covered; that the hole was likewise covered when Westheimer was through with the use of the shaft, so far as he knew; that this covering would prevent a man from falling into the hole; that a tarpaulin belonging to Henger was placed over the hole when not in use to keep the rain and cold out of the basement; Smith was a gang foreman for Westheimer. On the day he was injured he arrived at the building about 8 o'clock in the morning; it was a cold, windy day, and there was some rain and mist. He was told by the timekeeper that there would be no work until noon; that if "it fairs off we will go to work at noon." He walked outside of the building for the purpose of looking down in the shaft to see how to get a line down into the basement to pull some heavy equipment in place. I now quote:

"A. I walked out on the outside of the building and was going to stand there for a short while, and this tarpaulin was over this hole, as if it was covered up. It looked just like it had been any time we had ever covered it up with the big timbers under it and tied out to the corners of this derrick, and you couldn't see under this to see if there were any timbers or not. I leaned up against the derrick, which has about a six-inch fall from the bottom, or four-inch fall, lean in from the toe, down against the bottom of the derrick to this X-brace. It caught me just across, just above the knees, and I went to reach over to get hold of this canvass, just to peep down in this hole—there is always a light down in the basement—to see how to rig up a line from the top of the derrick down through there.

\* \* \* \* \* \*

"A. This tarpaulin was laying on the middle timbers and the wind was blowing against it and flopping up and down, and you couldn't see these 2 x 10's on the outside because it was stretched over there

and sagged and tied to the legs of the derrick, and there was no way to see how the timber was under that tarpaulin.

"Q. Look at Exhibit 1 and point out to the jury where the 2 by 10's would have been had they been there. A. They would have been on the toe of this angle which is sticking in here. The 2 by 10's covered this 20 inches of space in here. I was standing here and looked over this way, and I reached over to get that and the corner of that was tied to that leg there. No way to determine that except to get down on my knees, and I don't make a practice of that in this iron work. There was some pebbles or gravel here—I don't know yet how I got in the hole. * * *

"Q. Was there any difference in the way this shaft appeared to you on the morning of March 13th from the way it appeared to you when it was properly covered by your men? * * * A. This tarp looked as it had at any time during the time we had put it there, and I had seen it many times. * * *

"Q. The portion of the hole through which you fell is this west end, is that correct—southwest end? A. That is right."

And from cross-examination:

"Q. On which side of the derrick were you? A. I was on the southwest corner, against the building.

"Q. Let's see if we can show the jury just where you were here on one of these exhibits. I will let you find the one you can show it best in. A. This one right here.

"Q. Will you take the pencil and hold it up so the jury can see and you show them where you were standing. A. I was standing right there, jurymen; right against this door facing, right in there.

"Q. In other words, the braces were on the side that you were standing on? A. That is right.

"Q. Those X-braces you see here in plaintiff's Exhibit I? A. That is right.

"Q. All right. Is this the angle iron that sticks up six inches there? A. That is right.

"Q. Were your toes against that? A. Yes, sir. When I turned around—now,

then, this is the action I went through * * * I testified I turned around and started to pick up this canvass to look under it, to see how to put a block down this hole, and gravel was under my feet and my legs were against this here, and why I went in the hole I don't know to this day.

"Q. That is what I understood you to say. Let's see where your body was. Did you crawl under these braces and get inside this angle iron, or did you stand outside the angle iron and braces? A. I stood straight up. This angle iron hit me across this way. Take this here, for instance, this angle iron runs down here and hit me right here. I was leaning over like this, and had this arm hanging on that brace right there. I had my hand on this brace right up here, and I leaned over to get hold of this canvass here. When I leaned to get hold of the canvass my feet went out from under me, and that is all there is to it.

"Q. In order to do that, you had to go through these braces? A. That is right.

"Q. And outside of this angle iron? A. That is right.

"Q. And you had to lean through the braces? A. That is right.

"Q. Did you lean through this space, or under it? A. I leaned through that space. Naturally I would; had something to lean against.

"Q. And you reached over with what hand to pull up the tarpaulin? A. Right hand.

"Q. And you don't know how you slipped in the hole? A. My feet went out from under me, and that is exactly how I went in; only way I could have done it.

"Q. You knew the hole was there? A. Yes, sir; but I didn't know what was under that canvass; supposed to be some boards there, that weren't there. The only reason I fell into the hole, there wasn't anything to catch to.

"Q. Something gave way under your feet? A. Certainly. There were some pebbles there.

* * * * * *

"A. I was trying to be as safe as possible. If these pebbles hadn't been on

there, I wouldn't have fallen in the hole. It was just strictly an accident."

The negligence of which Henger was specifically convicted by the jury's finding was: Failure to have adequate railing around the shaft and failure to properly inspect the shaft. There were also findings that failure to have the shaft securely covered with timbers over the entire surface of the opening, and failure to warn Smith that the tarpaulin covering the shaft was not supported by timbers securely covering the entire surface of the opening was negligence, but it was not specifically found that such negligence was the negligence of Henger. I assume, however, that the verdict should be so construed.

One of Henger's points is that the uncontroverted evidence reflects that he was an employee or agent of the bank, empowered or authorized to co-ordinate the construction of its building, and since no affirmative act of negligence was committed by him the judgment is erroneous. Smith counters that the undisputed evidence discloses that Henger was the general contractor of the bank, and as such had the exclusive control of the premises and the bank did not have the right to control the details of the work to be performed by him. In a supplemental brief filed by the association it is urged that whether Henger was an independent contractor in the construction of the building was at least a question of fact which will be presumed to have been found by the trial court so as to support the judgment under Rule 279, Texas Rules Civil Procedure, since no issue on this question was requested.

In my opinion it is unnecessary to determine whether Henger was a general contractor, an independent contractor or an agent or servant of the bank in performing his duties under his contract with the bank. It is true that in this state and in other jurisdictions "in general" the applicable rule is that quoted by Judge Stayton in Labadie v. Hawley, 61 Tex. 177, 179, 48 Am.Rep. 278: "The rule is, that an agent is personally liable to third persons for doing something which he ought not to have done, but not for not doing something which he ought to have done. In the latter case the agent is liable only to his employer." Then Judge Stayton also quoted from Henshaw v. Noble, 7 Ohio St. 226, 232: "The principal is always liable to third persons for the misfeasances, negligences and omissions of duty of his agent, in all cases within the scope of his agency. The agent is also personally liable to third persons for his own misfeasances and positive wrongs. But he is not, in general, liable to third persons for his own nonfeasances or omissions of duty in the course of his employment. His liability in these latter cases is solely to his principal, there being no privity between them and such third persons; the privity exists only between him and his principal. And hence the general maxim as to all such negligences and omissions of duty is, in cases of private agency, respondeat superior."

The rule was applied in Eastin & Knox v. Texas & P. R. Co., 99 Texas 654, 92 S. W. 838, opinion by Judge Gaines, where the negligence of the agent was an affirmative act, and in Montgomery v. Allis-Chalmers Mfg. Co., Tex.Civ.App., 164 S. W.2d 556, Wr. Ref. W. M., and in Seismic Explorations v. Dobray, Tex.Civ.App., 169 S.W.2d 739, Wr. Ref. W. M., where the negligence of the agent was held to be nonfeasance. See also Vol. 2, Tex.Jur. p. 391, Sec. 179. For a criticism of the rule see 7 Labatt's Master & Servant, Sec. 2586, p. 7967 et seq.

However, regardless of the relationship between Henger and the bank, Henger did assume his duties under the contract "as a general supervisor and co-ordinator of construction" of the building. He loaned the tarpaulin to Westheimer. It is inferable from the evidence that under his instructions Westheimer covered the timbers placed over the hole with the tarpaulin to keep cold air and rain from the basement where men were working. Smith's cause of action is not for a breach of Henger's contract with the bank, but is for damages sustained from Henger's tort. An agent or servant undertaking the performance of his principal's or master's duty to look after the safety of others is personally liable for negligence in failing to perform that duty, it matters not whether such negligence consists of his misfeasance or non-

feasance. I regard the case of Fox v. Dallas Hotel Company, 111 Tex. 461, 240 S.W. 517, as applicable and decisive of this point.

By appropriate points questions are presented whether under this record there is any evidence to support any findings of negligence of Henger and of proximate cause of such negligence. In other words, whether Henger was under a duty to Smith to have an adequate railing around the shaft; to see that it was adequately covered with timbers over the entire surface, or to inspect it when not in use; or to warn Smith that the tarpaulin covering was not adequately supported by timbers, and if such duties were imposed upon Henger whether there is any evidence that his failure to perform any of them was a proximate cause of Smith's injuries.

On further consideration, aided by the Association's able argument in support of its motion for a rehearing, I have concluded that we were in error in holding, at least inferentially, that there was no duty to Smith imposed on Henger to use ordinary care to inspect the shaft in order to protect Smith from its hidden danger, and that there was no evidence to support the jury findings that Henger's failure to properly inspect the shaft was negligence, and such negligence was a proximate cause of the fall of Smith. Certainly it was not the purpose or intention of this writer to usurp the functions of the jury as so plangently asserted by appellees.

The rule by which we are governed is that enunciated by the Supreme Court in Wininger v. Fort Worth & D. C. Ry. Co., 105 Tex. 56, 143 S.W. 1150, and many times followed that "If, discarding all adverse evidence, and giving credit to all evidence favorable to plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." We cannot disregard the jury findings and render judgment for appellant. In other words, in passing on this question "It is our duty to disregard all conflicts in the testimony; to consider the evidence adduced in the case in the light most favorable to plaintiff, and to indulge in his favor every intendment reasonably deducible from

the evidence." James v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 182 S.W.2d 921, 922, Wr. Ref.; Wilder v. Malone, Tex.Civ.App., 212 S.W.2d 938. The jury are the judges not only of the facts proved but of the inferences to be drawn therefrom, provided such inferences are not unreasonable. Lockley v. Page, 142 Tex. 594, 180 S.W.2d 616.

The main reason for my assent to our former holding was the firm conviction that the record pointed unerringly to the negligence of Westheimer in failing to adequately cover the shaft. That conviction has been dispelled by the testimony of McCullough and Miller. In view of this testimony, which we must accept in the light most favorable to appellees, the factual situation boils down to this: The shaft was adequately covered by Westheimer's men when they quit work at 2:30 o'clock P. M. on March 12, 1943; that is, the heavy timbers were pushed out of the building across the tower and the 2 by 12's were placed along their sides, fitting down in and resting upon the angle irons. In other words, the hole was completely covered with timbers. At some time between 2:30 P.M. on March 12 and 8:15 or 8:30 A.M. on March 13, the 2 by 12's covering the space through which Smith fell were removed. Although Miller's testimony is rather indefinite, it does warrant an inference that other contractors working in the basement had occasion to use the shaft to lower material during this time. There was evidence that Henger had a watchman stationed at the gate on the main street entrance to the premises, which was in close proximity to the shaft; that this watchman went to work, or "came on" duty at seven in the morning, and that on March 11th he had warned Smith that "they were in the habit of leaving it (the shaft) open, so somebody was liable to fall in there and get killed." There was also evidence that Smith and his crew arrived on the premises at about five minutes before 8 o'clock on the morning of the 13th, and were inside the building standing around a fire approximately 30 feet from the hole, between fifteen and thirty minutes before the timekeeper gave them Billings' message that they would not work that morning.

This evidence warrants the inference that the shaft remained in the inadequately covered condition in which it was when Smith fell into it from five minutes before 8 o'clock until 8:15 or 8:30, and I think from 7 o'clock, when the watchman went on duty until 8:15 or 8:30, the time of the fall.

As a matter of law under the contract between Henger and Westheimer, Westheimer was an independent contractor, the work contracted for being the lowering of heavy air conditioning equipment into the basement of the bank's building. While Henger agreed to furnish a derrick to be used by Westheimer in the performance of the work, he retained no right to exercise control over the method or means that Westheimer should employ as to the details of the work. This is the supreme test. Shannon v. Western Indemnity Co., Tex. Com.App., 257 S.W. 522; Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S.W.2d 905; Standard Ins. Co. v. McKee, 146 Tex. 183, 205 S.W.2d 362.

Smith, as an employee of Westheimer, was on the premises at the time of his fall as an invitee. Galveston-Houston Electric R. Co. v. Reinle, 113 Tex. 456, loc. cit. 462, 258 S.W. 803, loc. cit. 804(1); Kuptz v. Ralph Sollitt & Sons Const. Co., 5 Cir., 88 F.2d 532, loc. cit. 534(1, 3); American Steel & Wire Co. v. Sieraski, 6 Cir., 119 F.2d 709, loc. cit. 710(3); Holt v. Texas-New Mexico Pipeline Co., 5 Cir., 145 F.2d 862, loc. cit. 863.

The fact that he had been told there would be no work that morning is immaterial. *His purpose in looking into the shaft was in furtherance of Westheimer's business, and not for his personal curiosity or pleasure.* He testified that A. G. Wooldridge "a direct foreman for Westheimer" in the hole, asked him to look in the hole. His status of invitee which he bore when he came on the premises that morning had not changed. Henger having the "exclusive control, supervision and co-ordination of construction" of the building and having possession of the premises for that purpose stood in the same relation to Smith as the owner, and owed him the same duty as though he had been the owner. His obligation, whether arising from "the duty of exercising ordinary care to furnish him a reasonably safe place to work", Montgomery v. Houston Textile Mills, Tex. Com.App., 45 S.W.2d 140, 143, holdings approved, or from a "duty to exercise ordinary care to keep its premises in a reasonably safe condition, so that the plaintiff (invitee) would not be injured" Carlisle v. J. Weingarten, Inc., 137 Tex. 220, 152 S.W.2d 1073, loc. cit. 1074(1, 2), was the same, i. e., to exercise ordinary care to protect Smith from the hidden danger or trap which the shaft inadequately covered constituted. It is true that Smith's testimony shows that he had knowledge that the shaft had on former occasions been found inadequately covered after Westheimer had left it adequately covered; that his knowledge in this respect was equal to, if not superior to, the knowledge of Henger or Henger's foreman; but there is no jury finding that Smith failed to exercise ordinary care to discover the inadequate covering of the shaft at the time of the accident—in other words, that he was negligent in this respect. No specific finding on such issue was submitted or requested and any defense based thereon was therefore waived. Rule 279, T.C.R.P.

The findings that Henger's failure to have adequate railing around the shaft was negligence and a proximate cause of the fall may be disregarded. The only purpose an adequate railing around the shaft could have served would have been to warn of the presence of the shaft, which was well known to Smith and as a matter of law Henger owed him no duty to warn him of such presence; also there is no evidence that failure to have such railing had anything to do with the cause of Smith's fall. There is no basis for the findings that failure to have the shaft covered with timbers over the entire surface of the opening and failure to warn Smith that the tarpaulin covering the shaft was not supported by timbers securely covering the entire surface of the opening was negligence (presumably of Henger) unless Henger was negligent in failing to inspect. In the absence of an inspection Henger could not have known of the defective covering, and without such knowledge he could not have been negligent in failing to warn any one of such condition. Hence, if the judgment

against Henger is to be sustained, it must be on the findings that Henger failed to properly inspect the shaft; that such failure was negligence and a proximate cause of Smith's fall. The evidence clearly supports the finding that Henger failed to properly inspect the shaft. In my opinion we cannot say that the finding that such failure was negligence is without support in the evidence. Henger was charged with knowledge that the hole had been found uncovered after Westheimer had properly covered it on former occasions. He was in control of the premises, including the shaft, when it was not in use by Westheimer and the other contractors. In view of Miller's testimony the jury could properly infer that the shaft was used by other contractors after Westheimer covered it on March 12th, before Smith fell into it on March 13th. Whether under such circumstances the exercise of ordinary care for the safety of those on the premises as invitees, and especially those having duties in connection with the use of the shaft would require an inspection after each contractor finished using the shaft was a question of fact for the jury, and their finding that Henger's failure to properly inspect was negligence could have been based on this theory. Nor can we say that the finding that such negligence was a proximate cause of Smith's fall is without support in the evidence. If it be assumed, as I think it may be, that the jury could have properly inferred that the shaft was not disturbed from five minutes before 8 o'clock until 8:15 or 8:30, or from 7 o'clock until 8:15 or 8:30, but that it remained inadequately covered during at least these times, then under the holding in R. E. Cox Dry Goods Co. v. Kellogg, Tex.Civ.App., 145 S.W.2d 675, Wr.Ref., sufficient time elapsed in which in the exercise of ordinary care by proper inspection, appellant could have discovered the defective covering and averted the accident, at least an issue of fact was raised as to this question. The jury's finding that Henger's negligence in failing to properly inspect the shaft was a proximate cause of the fall of Smith should therefore be sustained.

Appellant lays much stress on the manner in which Smith fell into the hole. He contends that the accident was unusual and could not have been reasonably foreseen; that since Smith testified that he did not know how he got into the hole and that if the pebbles had not been there he would not have fallen into the hole and that it was just strictly an accident, the inadequate covering of the hole was merely a condition and not a proximate cause of the fall; that Smith's act in attempting to look into the hole was an intervening cause and this act, as well as the presence of the pebbles which caused Smith's feet to slip out from under him, intervened between the condition of the hole and cut off the condition of the hole as a proximate cause. Such contentions are without merit. It is elementary that it is not necessary that the identical happening must be reasonably foreseeable; the rule is satisfied if a like result may have been reasonably foreseen. Quoting from Atchison v. Texas & P. R. Co., 143 Tex. 466, 186 S.W.2d 228, loc. cit. 231 (5): "(5) To make a negligent act the proximate cause of an injury it is not essential that the particular injurious consequences and the precise manner of their infliction could reasonably have been foreseen. If the consequences follow in unbroken sequence from the wrong to the injury, it is sufficient that if at the time of the original negligence the wrongdoer might by the exercise of ordinary care have foreseen that some similar injury might result from the negligence."

The hole inadequately covered with timbers, with such covering concealed by the tarpaulin, was in fact a death trap. In this condition it certainly was not beyond the realm of foreseeability that some one might fall into it. Especially is this so when it is considered that many workmen were on the premises, engaged in using the hole, and would necessarily have to uncover it before they used it. That it could not have been reasonably foreseen that a fall would occur by reason of some one attempting to pick up the canvas and look into the hole was not necessary. Nor did Smith's action and the presence of the pebbles intervene so as to render the condition of the hole too remote to constitute it a proximate cause. Again quoting from Atchison v. Texas & P. R. Co., supra: "(4) The

proximate cause is not always the one nearest the injury, and if the original negligence concurs with some new cause or agency in producing an injury, the original negligence remains a proximate cause thereof and the original wrongdoer will not be relieved of liability because subsequent events or agencies may have concurred with the original negligence in bringing about the injury."

The doctrine of transitory dangers enunciated in Allen v. Republic Building Co., Tex.Civ.App., 84 S.W.2d 506, 507, cited and relied on by appellant has no application to the facts of this case.

Appellant earnestly insists that the evidence convicts Smith of contributory negligence as a matter of law. The findings on contributory negligence were: That Smith did not fail to keep a proper lookout for his own safety; that he did not approach too near the edge of the shaft; that his attempt to raise the tarpaulin and look under it without first ascertaining that the timbers were in place was not negligence. As heretofore pointed out, no specific issue was submitted or requested as to whether or not Smith was negligent in failing to discover the inadequate covering of the shaft. In view of his knowledge that it had been found inadequately covered on former occasions, such issue was raised, but was waived by appellant's failure to request submission thereof. Appellee Smith is in error in the statement in his brief that on the occasions when he knew by the appearance of the shaft that it had been used the night before "the tarpaulin would be off of it and the timbers out of the way". Smith testified:

"Q. You frequently came on the job and found the timbers were removed? A. That is right.

"Q. And sometimes one of them would be out of the way and moved, and sometimes others; is that right? A. That is right.

"Q. And you have found as many as three or four of the timbers moved and out of place when you would go there in the morning? A. *After we would take the tarpaulin off*, yes, sir."

The evidence is ample to show that from the appearance of the shaft on the morning of the accident it was not apparent that it was inadequately covered. Its dangerous condition was not open and obvious, but was hidden. The jury's finding in effect acquits Smith of negligence in failing to discover that the shaft was inadequately covered and is perhaps broad enough to acquit him of such negligence in view of his knowledge as to its condition on former occasions. In any event, his knowledge of the condition of the shaft on former occasions, and that it might be dangerous in the condition in which it appeared on the morning of the accident, if such knowledge may be imputed to him, is not sufficient to convict him of contributory negligence as a matter of law. In McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W.2d 442, loc. cit. 447(4-7), the court said: "The mere fact that a person may expose himself to a danger will not preclude a recovery. In order to preclude a recovery the danger must be such that a person of ordinary prudence under like circumstances would not subject himself to it. 28 C.J. 598. The mere fact that a person may participate in an operation attended by some latent danger will not render him guilty of contributory negligence as a matter of law. It is the established rule in this State that even where a person has knowledge, actual or imputed, of a defect, a question of fact as to negligence is presented unless it can be said, as a matter of law, that a person of ordinary care would not have incurred the risk." citing numerous authorities. This point should be overruled. Also points 9 and 10 to effect that there is no evidence to sustain the jury findings upon issues of liability of Henger and that if there is any evidence which raised such issues it is insufficient to support the findings. What has been said sufficiently disposes of these points.

There was no error in the court's action in sustaining plaintiff's motion to require the defendant to refrain from alluding to plaintiff's settlement of the workmen's compensation suit and payment thereunder.

Myers v. Thomas, 143 Tex. 502, 186 S.W. 2d 811, is controlling on this point.

Appellant complains of certain argument by counsel for Smith and counsel for the Association and of the arguments of such counsel considered in its entirety. Some of the argument of which he complains was not called to the attention of the trial court in his amended motion for a new trial, nor was there any assignment in such motion that the argument of both counsel, considered as a whole, was prejudicial. In the absence of such assignment we are without power to consider such argument. Rules 324 and 374, T.R.C.P.; Kendall v. Johnson, Tex.Civ.App., 212 S.W.2d 232, I have carefully considered all of the argument which was assigned as error in defendant's amended motion for new trial, and in view of the court's rulings in reference thereto find no reversible error.

Special Issue No. 21 included as an element of damage the diminished earning capacity of Smith to work and earn money in the past and in the future. Appellant presents points that the evidence was insufficient to sustain any finding on diminished earning capacity, and in this connection that the court erred in permitting Smith's wife to testify to the amount of joint profits from a cafe operated by her and a welding shop operated by her husband for twelve months immediately preceding the trial, and that the verdict is excessive. It would unduly prolong this dissenting opinion to set out in detail the evidence under these points. Smith testified as to his earnings prior to the accident; that he was engaged in structural steel work which required a certain amount of heavy lifting; that he had not been able to engage in this kind of work since the accident. The medical testimony shows the nature and extent of his injuries and that he probably never will be able to engage in such work. His wife testified that the first work of any kind he did after the accident was in June 1945. Smith also testified that he netted about $150.00 per month from the operations of a welding shop from June or July in 1945, and during the year 1946, and about $400.00 per month or $5000.00 per year in 1947. His wife also testified over objection that the profits from a cafe operated by her, and the welding shop, for twelve months preceding the trial was between $4000.00 and $5000.00. This evidence was sufficient to sustain a finding of diminished earning capacity both prior to the date of the trial and thereafter. Triangle Cab Co. v. Taylor, Tex.Civ.App., 190 S.W.2d 755, affirmed 144 Tex. 568, 192 S.W.2d 143; and authorities there cited.

In McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712, the court said: "If plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury." Of course the question for the jury's determination was not what he actually earned before and after his injuries, but what his earning capacity was and to what extent that capacity had been impaired. El Paso Electric Co. v. Murphy, Tex.Civ.App., 109 S.W. 489. Smith's testimony that he netted about $150.00 per month from the welding shop from June or July 1945 and in 1946 and about $400.00 per month or $5000.00 per year in 1947 was more favorable to appellant than the law required, because the capital and labor employed and the extent of Smith's participation in the business was not shown so as to enable the jury to appraise the value of his personal services in connection with the profits earned. See Dallas Railway & Terminal Co. v. Guthrie, 146 Tex. 585, 210 S.W.2d 550, and in the absence of such showing the jury would unquestionably consider the net profits as the value of his personal services. His wife's testimony that the joint profits from the cafe and the welding shop for 12 months preceding the trial was between $4000.00 and $5000.00, though improperly admitted, could have in no way prejudiced appellant since from such testimony it appears that the profits from the cafe and welding shop did not exceed the profits from the welding shop alone, according to Smith's testimony.

Smith was 36 years of age at the time he was injured. That his injuries were serious, painful and permanent is amply shown by the evidence. The following is copied from appellant's brief:

"Dr. C. Frank Brown testified that he first treated the plaintiff on the date of the accident immediately after he had been removed to the hospital; that he was primarily suffering from shock, injury to his chest and lacerations of his scalp and elbow; that X-rays revealed a fractured collar bone, a fracture of the chest and second ribs, right shoulder blade and right femur and left fibula in his leg; that he contracted pneumonia during the second twenty-four hours; that he also had internal injuries which caused great pain; that after plaintiff had recovered from his pneumonia another examination reflected that his right lung had been compressed to one-half its normal size and also a kidney which necessitated a rupture of the peritoneal sac by an operation. Three days following a second operation was performed and it was necessary for plaintiff to wear a drainage tube; that he remained at Parkland Hospital until the 30th day of March, 1943; that draining stopped again and it was necessary for him to have a third operation at Baylor Hospital during the latter part of June and he remained there until July 30, 1943; that the incision closed completely in September, 1943; that he was able to be up and around the house in October, 1943. There is testimony with regard to the treatment of his fractured leg and treatment of his back and other parts of his body. Dr. Brown testifies as follows in regard to any permanent injuries: (Italics ours.)

"'Q. Would you say the injury which Mr. Smith sustained to his liver was one of a serious, permanent nature or not? A. Yes, I would think of all of the injuries that Mr. Smith has had, the injury to his liver *is more likely to be permanent and more likely to be disabling to him* than his other injuries, because he has recovered from his pneumonia, his fractures have healed and fortunately his bones are in good position to where he has very little impairment in the use of his body, as far as the bone structure is concerned. He does have a certain amount of pain and discomfort in these injured bones. But he has recovered from all of those things. However the damage that has been done to his liver is a permanent damage and the liver doesn't have the capacity of rebuilding itself, once it is damaged and scar tissue has replaced the normal structures of the liver cells. (S.F.150)'"

There was medical testimony evidencing the opinion that Smith would never be able to perform heavy manual labor. The jury awarded $25,000.00 for physical pain and mental anguish, and for diminished earning capacity. $3130.00 was stipulated as reasonable and necessary doctor, medical and hospital expenses. Comparisons are not helpful. In my opinion the verdict was not excessive and evidences no passion or prejudice.

Appellant's 17th point complains of the court's refusal to submit his requested issue inquiring whether the condition of the covering and protection of the shaft as it appeared on the morning of March 13th was caused by plaintiff and the Westheimer men working with and under him. The pleading on which he relies to warrant the submission of such issue is that plaintiff failed to use that degree of care and caution for his own safety which a reasonably prudent person would have exercised under the same or similar circumstances "in failing to see to it that said shaft was covered and protected when the men who were working under him ceased operations on the day before, it being plaintiff's direct duty and responsibility to see that it was so covered and protected." The requested issues referred to in support of the point are:

"(a) Do you find from a preponderance of the evidence, that it was the duty of the plaintiff Haskell Smith, and the men working under him, to keep said shaft covered and protected at, and prior to, the time said accident occurred?

"Answer 'Yes' or 'No'.

"If you have answered subdivision (a) hereof 'Yes' but not otherwise, then you will answer this question.

"(b) Do you find from a preponderance of the evidence, that the condition of the covering and protection about said shaft at the time plaintiff fell into same, was due to the failure upon the part of plaintiff,

Haskell Smith, and the men working under him, to see that said shaft was properly covered and protected?

"Answer 'Yes' or 'No'."

It is at once apparent that the point here presented is not supported by the record referred to. The inquiry embraced in the point is whether the defective covering which the shaft had at the time of Smith's fall was caused by Smith and Westheimer's men working with or under him, in other words whether or not they failed to properly cover the shaft when they quit work and the shaft remained in that condition until the time of the accident. The pleading supports such an issue, but the requested issue (a) inquires whether it was the duty of Smith and the men working under him to keep the shaft covered and protected at and prior to the time of the accident. Obviously there is a vast difference between the pleadings and the point which it supports and which is now urged and the issues requested. There is no evidence that Smith or the men working under him were under any duty to keep the shaft covered and protected when not in use by Westheimer. The extent of their duty as reflected by this record was to adequately cover the shaft when Westheimer ceased to use it. No issue as to whether or not they did this was requested. The court did not err in refusing to submit requested issues (a) and (b).

What has been said disposes of Henger's 18th and last point. As a matter of law Smith at the time of the accident was on the premises as an invitee. The requested issue inquiring whether he remained in and about the premises and near the opening of the shaft at a time when he had been informed his crew would not work that day (morning) and he had no duties to perform at that time asked for a finding on undisputed facts which would not be determinative of whether Smith's status at the time of the accident was that of a licensee. The court did not err in refusing to submit this issue.

The trial court was of the opinion that under the authority of Traders & General Ins. Co. v. West Texas Utilities Co., 140 Tex. 57, 165 S.W.2d 713 (Com.App. opinion adopted) attorneys fees of $2166.67

(no question of the reasonableness thereof being involved) was properly chargeable against Smith's recovery in favor of the Association in satisfaction of its rights of subrogation provided by Art. 8307, § 6-a, Vernons Ann.Civ.St. After a careful analysis of the opinion in that case and the authorities cited in the briefs of both parties on Smith's cross-appeal, I concur in the opinion of the trial court.

In my opinion the judgment should be in all respects affirmed.